# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE EXAMWORKS GROUP, INC. STOCKHOLDER APPRAISAL LITIGATION | ) ) ) ) ) | Consolidated C.A. No. 12688-VCL |

## MEMORANDUM OPINION

Date Submitted: February 13, 2018
Date Decided: February 21, 2018

Stuart M. Grant, Michael J. Barry, Jeff A. Almeida, Kimberly A. Evans, Rebecca Musarra, GRANT & EISENHOFER, P.A., Wilmington, Delaware; Vincent R. Cappucci, Jordan A. Cortez, ENTWISTLE & CAPPUCCI, LLP, New York, New York; *Co-Lead Counsel for Petitioners.*

Raymond J. DiCamillo, Kevin M. Gallagher, Ryan P. Durkin, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Michele D. Johnson, Kristin N. Murphy, LATHAM & WATKINS LLP, Costa Mesa, California; Blair Connelly, LATHAM & WATKINS LLP, New York, New York; *Counsel for Respondent*.

**LASTER, Vice Chancellor.**

The petitioners in this appraisal proceeding seek a judicial determination of the fair value of their proportionate interest in ExamWorks Group, Inc. ("ExamWorks" or the "Company"). The Company has filed two motions for discovery sanctions.

The first motion seeks sanctions against five funds who retained the law firm of Entwistle & Cappucci, LLC as their principal counsel.[1] The Entwistle Petitioners failed to produce any documents during the period allotted for fact discovery and said nothing about any delays in production. Six weeks after the discovery cutoff, and four days after the exchange of expert reports, the Entwistle Petitioners produced 68,052 pages of documents.

The second motion seeks sanctions against all petitioners.[2] In their discovery responses, the petitioners agreed to provide the Company with copies of documents obtained from third parties. In March 2017, the petitioners obtained documents from Barclays Bank PLC. The petitioners did not produce copies of the documents. Ten weeks after the discovery cutoff, the petitioners produced over 60,000 pages of documents from Barclays.

Both motions seek sanctions for the belated production of privilege logs. None of the petitioners produced privilege logs during the discovery period. Almost two months after the discovery cutoff, the Entwistle Petitioners produced sloppy and inadequate logs.

---

[1] *See* Dkt. 72 (the "Entwistle Motion"). This decision refers to the five funds as the "Entwistle Petitioners." The parties called them the "WI Petitioners," a cryptic moniker that seemed to refer to "Water Island," which is the name of one of the funds.

[2] *See* Dkt. 81 (the "Barclays Motion").

Five other petitioners had retained the law firm of Grant & Eisenhofer P.A. as their principal counsel.[3] Ten weeks after the discovery cutoff, the G&E Petitioners produced their logs. Although the G&E Petitioners did a better job than the Entwistle Petitioners, the logs arrived too late to be of any use for discovery.

This decision grants the motions and imposes sanctions for the petitioners' failures to comply with their discovery obligations.

## I.     FACTUAL BACKGROUND

The facts are drawn from the submissions made in connection with the motions. The parties devoted much more attention to argument and invective than to the underlying facts, making it more difficult than necessary to derive the applicable timeline. The following discussion does not comprise findings of fact in the post-trial sense, but rather represents how the record appears at this preliminary stage.

---

[3] This decision calls them the "G&E Petitioners," which is a term the parties used. Unfortunately, it is not entirely clear which petitioners are included in that term. The Barclays Motion identified the five petitioners who produced logs on December 12, 2017, as "Pivot Point Capital, Hudson Bay, Lord Abbett, Paloma, and Weiss Asset." The opposition introduced the term "G&E Petitioners" and cited this passage in the Barclays Motion. The opposition did not otherwise identify who comprises the G&E Petitioners, and I cannot find any reference on the docket to "Paloma" or "Weiss Asset" being petitioners. Because the rationale for this decision turns on the production of documents and privilege logs months after the discovery cutoff, I can leave this detail to the parties.

2

## A.    The ExamWorks Merger

ExamWorks is a Delaware corporation with its principal place of business in Atlanta, Georgia. ExamWorks completed an initial public offering in 2010, and its stock traded on NASDAQ under the symbol "EXAM."

On April 27, 2016, ExamWorks announced that it had entered into a merger agreement with affiliates of Leonard Green & Partners, L.P. The merger closed on July 27, 2016. Pursuant to the merger agreement, ExamWorks' publicly traded common stock was converted into the right to receive $35.05 per share, subject to the holder's statutory right to eschew the merger consideration and seek appraisal.

## B.    This Appraisal Proceeding

After the announcement of the merger, the following investment funds perfected their appraisal rights and filed appraisal petitions in this court:

- Hudson Bay Master Fund Ltd. and Hudson Bay Merger Arbitrage Opportunities Master Fund Ltd. (together, "Hudson Bay").

- Lord Abbett Series Fund Inc.—Value Opportunities Portfolio; Lord Abbett Securities Trust—Lord Abbett Value Opportunities Fund; and Lord Abbett Research Fund, Inc.—Small Cap Value Series (collectively, the "Lord Abbett Funds").

- Water Island Global Master LP, The Arbitrage Fund, The Arbitrage Event-Driven Fund, Columbia Active Portfolio Multi-Manager Alternative Strategies Fund, and Litman Gregory Masters Alternative Strategies Fund (collectively, the "Entwistle Petitioners").

- Brookdale International Partners, L.P. and Brookdale Global Opportunity Fund (together, the "Brookdale Funds").

- Sunrise Partners Limited Partnership ("Sunrise").

- Pivot Point Capital Master LP ("Pivot Point").

- Magnetar Capital Master Fund, Ltd. and Third Motion Equities Master Fund Ltd. (together, the "Magnetar Petitioners").

Certain petitioners moved to consolidate the appraisal proceedings and for the appointment of lead counsel. By order dated September 1, 2016, the court consolidated the actions and appointed as Co-Lead Counsel the law firms of Grant & Eisenhofer, P.A. and Entwistle & Cappucci, LLC.[4] The order placed Co-Lead Counsel in charge of the consolidated action, stating:

10. Petitioners' Co-Lead Counsel shall set policies for the prosecution of the Consolidated Action, shall delegate and monitor the work performed by petitioners' attorneys to avoid duplication of effort or unnecessary expense, *shall coordinate on behalf of petitioners the initiation and conduct of discovery proceedings*, shall have responsibility for all Court filings and appearances (except with respect to any Entitlement Hearing), and shall have the authority to negotiate a settlement of the Consolidated Action subject to approval of petitioners and the Court.

11. Co-Lead Counsel shall be available and responsible for communications to and from this Court, including distributing orders and other directions from the Court to counsel.

12. No motion, request for discovery or other pre-trial or trial proceedings shall be initiated or filed by any petitioner except through Co-Lead Counsel. Respondent's counsel ay rely upon all agreements made with Co-Lead Counsel, or other duly authorized representative of Co-Lead Counsel, and such agreements shall be binding on all petitioners.[5]

---

[4] Dkt. 5 (the "Consolidation Order").

[5] *Id.* ¶¶ 10-12 (emphasis added).

The Consolidation Order provided that "[a]ny disputes among Co-Lead Counsel which cannot be resolved after consultation shall be decided based on a vote of the Petitioners in the Constituent Actions."[6]

## C.      The Scheduling Orders

The parties agreed on a schedule for the action, which the court approved by order dated September 26, 2016.[7] Paragraphs 1(a)-(d) of the Initial Scheduling Order stated:

(a)     The parties shall produce documents on a rolling basis and shall substantially complete document production on or before December 2, 2016, in response to any document requests that are served on or before October 3, 2016;

(b)     The parties shall produce documents on a rolling basis in response to any document requests served after October 3, 2016, and shall substantially complete document production in response to such requests by the later of February 24, 2017, or eight weeks after service;

(c)     The parties shall produce an initial privilege log on or before January 31, 2017, and shall promptly provide supplemental privilege logs if productions made subsequent to this date withhold privileged materials;

(d)     All fact discovery shall be completed by July 26, 2017, including any party and third-party depositions but excluding any fact discovery subject to a motion to compel or motion for protective order pending on July 26, 2017.[8]

---

[6] *Id.* ¶ 7.

[7] Dkt. 9 (the "Initial Scheduling Order").

[8] *Id.* ¶ 1(a)-(d).

5

The petitioners had already served their first set of requests for production of documents on August 25, 2016. On January 24, 2017, they served subpoenas on Barclays; Leonard Green & Partners, L.P.; Bank of America Corporation; Deutsche Bank Securities, Inc.; Evercore Partners LLC; Goldman Sachs Group, Inc.; and Merrill Lynch, Pierce, Fenner & Smith, Inc.[9] Barclays was one of the banks that provided debt financing for the merger. The petitioners served a second set of requests for production of documents on February 24, 2017.

## D.    The Amended Scheduling Order

On April 25, 2017, the parties submitted an amended schedule for the action, which the court entered the same day.[10] Paragraphs 1(a)-(c) of the Amended Scheduling Order stated:

(a)    The parties shall produce documents on a rolling basis and shall substantially complete document production on or before May 31, 2017;

(b)    The parties shall produce an initial privilege log on or before June 30, 2017, and shall promptly provide supplemental privilege logs if productions made subsequent to this date withhold privileged materials;

(c)    All fact discovery shall be completed by October 2, 2017, including any party and third-party depositions but excluding any fact discovery subject to a motion to compel or motion for protective order pending on October 2, 2017.[11]

---

[9] *See* Dkt 24.

[10] Dkt. 31 (the "Amended Scheduling Order").

[11] *Id.* ¶ 1(a)-(c).

The Company did not serve any requests for production of documents until May 31, 2017, which was the date for substantial completion of production under the Amended Scheduling Order.

Request Number 25 in the Company's requests for production of documents asked the petitioners to produce "all Documents received [by petitioners] from third parties in connection with this Action, including all Documents received in response to a subpoena or other request."[12] On June 30, 2017, the petitioners served their responses and objections. They agreed to "produce documents pursuant to document productions received from third parties subpoenaed in connection with the Action."[13]

## E. The Petitioners' Motion For A Protective Order

On July 31, 2017, the Company moved for a commission to serve a subpoena on Berkshire Partners LLC.[14] On August 10, 2017, the Company gave notice that it had served a subpoena on Berkshire seeking documents and testimony.[15] Berkshire had been a potential co-investor in the merger and participated in the negotiations before dropping out.

On September 26, 2017, during a meet-and-confer session, the petitioners asked about the status of documents produced by Berkshire. The Company produced the

---

[12] Dkt. 73 Ex. 2, at 14.

[13] *Id.* Ex. 3, at 23.

[14] Dkt. 48.

[15] Dkt. 50.

Berkshire documents on September 27, five days before the fact discovery cutoff of October 2.[16]

During the meet-and-confer session, the Company mentioned that it was considering a deposition of a Berkshire representative. The Company subsequently notified the petitioners that it intended to depose a Berkshire witness on November 9, 2017, after the discovery cutoff of October 2, 2017.[17]

The petitioners moved for a protective order, describing the post-cutoff deposition as "an abuse of the discovery process" that "completely disregards this Court's Amended Scheduling Order."[18] After briefing and argument, I granted the motion.[19] I explained that I was not granting the motion based on any finding of "conscious sandbagging or some type of intentional discovery misconduct."[20] Rather, I described the situation as one where "not enough was done to coordinate with the petitioners to provide documents on time, to be transparent about what was going on, and then ultimately it simply happened that the deposition did not get done within the discovery time frame."[21] I ruled that in light of the

---

[16] Dkt. 81 ¶ 9.

[17] *Id.* Ex. 6, at 18.

[18] Dkt. 60 ¶ 5.

[19] Dkt. 70 (the "Berkshire Ruling").

[20] Dkt. 79 at 26-27.

[21] *Id.* at 27.

timeline, "there needs to be a consequence," and "[a] fitting consequence is not to permit an exception to the discovery cutoff."[22]

## F.     The Entwistle Petitioners' Post-Discovery-Cutoff Production

On November 14, 2017, the Entwistle Petitioners produced 6,058 documents.[23] The documents arrived six weeks after the fact discovery cutoff of October 2 and four days after the parties exchanged initial expert reports. The Entwistle Petitioners had not produced any documents before the discovery cutoff.

The Company determined that 4,020 of the 6,058 documents contained redactions.[24] On November 24, 2017, the Company emailed Co-Lead Counsel to ask for an explanation.[25] On November 28, the Entwistle Petitioners produced a log indicating that, for 4,073 of the 4,546 documents containing redactions, the reason for the redaction was "Confidential/Not Relevant." The log shows that many of the redacted documents were copies of press releases, news articles, or other publicly available information.[26]

---

[22] *Id.*

[23] Dkt. 72 ¶ 19 & Ex. 15.

[24] *Id.* ¶ 20.

[25] Dkt. 74 Ex. 17.

[26] *Id.* Ex. 19.

The Entwistle Petitioner's production included a discounted cash flow analysis that appears to value ExamWorks in the range of $39.84 to $41.72 per share. By contrast, the petitioners' expert valued ExamWorks at $50.14 per share.[27]

## G.   The Petitioners' Post-Discovery Production Of The Barclays Documents

On December 6, 2017, the petitioners produced their valuation expert's rebuttal report. The report cited two documents that the petitioners had obtained from Barclays.[28] The petitioners had never provided the Company with any documents from Barclays. On December 13, the Company asked about the documents and demanded immediate production of all documents produced by Barclays or by any other party in response to a subpoena.[29]

On December 14, 2017, the petitioners produced over 60,000 pages of documents that they had obtained from Barclays (the "Barclays Documents"). Since then, the parties have analyzed the documents and determined that approximately 90% were documents that the Company placed in a data room for Barclays and its other lenders. Forty-six documents were not in the data room and not otherwise found in the production.[30]

---

[27] *Id.* Ex 24.

[28] Dkt. 81 Ex. 10, App'x C.

[29] *Id.* Ex. 13, at 1.

[30] *Id.* ¶ 15-16.

## H. The G&E Petitioners' Privilege Logs

Meanwhile, on December 12, 2017, the G&E Petitioners produced their privilege logs.[31] They arrived ten weeks after the discovery cutoff.

On December 15, 2017, the G&E Petitioners produced an additional 231 documents, consisting of over 1,300 pages of information.[32] The G&E Petitioners previously had asserted privilege for the documents, but after further consideration they removed them from their logs.

If the G&E Petitioners had taken this step earlier, it would have been a good thing. Instead, the documents arrived *after* the Company had completed the depositions of the petitioners' representatives. The late documents included a Hudson Bay email containing valuation parameters and a Lord Abbett email referring to communications with other stockholders about the merger. By themselves, the two documents do not appear momentous, but they should have been produced earlier so that the Company could have questioned the petitioners' witnesses about them. One can never predict what memories a document can unlock or refresh, nor the types of testimony that resulting lines of inquiry can elicit.

---

[31] *Id.* ¶ 11.

[32] *Id.* ¶ 12.

11

## I.        The Meet-and-Confer Sessions

The parties held meet-and-confer sessions on December 8, 11, and 12, 2017.[33] Under the consolidation order, Co-Lead Counsel were supposed to handle the case together and take joint responsibility for the litigation. But once the Company raised the Entwistle Petitioners' late production, Grant & Eisenhofer tried to go its own way, leaving Entwistle and its Delaware counsel, Rosenthal Monhait & Goddess, to clean up their clients' mess. They offered to re-produce the documents without redactions for relevance. They also offered to produce a witness for deposition, provide a privilege log, and allow the Company to propound additional discovery on the Entwistle Petitioners. They even offered to re-open expert discovery so that the Company's expert could take into account information learned from the production and deposition. On December 11, the Entwistle Petitions re-produced the belatedly produced documents without relevancy redactions.[34]

Grant & Eisenhofer sought to deal with the Barclays Documents. They proposed to strike the references to the two Barclays Documents from their expert's rebuttal report and to not rely on any of the other Barclays Documents at trial.

No one offered to do anything about the belated privilege logs.

---

[33] Dkt. 72 ¶ 26.

[34] Dkt. 74 Ex. 18.

## II.    LEGAL ANALYSIS

"[T]he purpose[s] of discovery [are] to advance issue formulation, to assist in fact revelation, and to reduce the element of surprise at trial."[35] These instrumental purposes in turn serve the overarching and "well established policy" underlying pretrial disclosure, which is that "a trial decision should result from a disinterested search for truth from all the available evidence rather than tactical maneuvers based on the calculated manipulation of evidence and its production."[36] "Candor and fair-dealing are, or should be, the hallmark of litigation and required attributes of those who resort to the judicial process. The rules of discovery demand no less."[37]

"Scheduling orders and discovery cutoffs further these important purposes and policies by ensuring that parties provide discovery in a timely fashion, thereby avoiding trial by surprise and the prejudice that results from belated disclosure."[38] "Parties must be mindful that scheduling orders are not merely guidelines but have the same full force and

---

[35] *Levy v. Stern*, 687 A.2d 573 (Del. 1996) (TABLE).

[36] *Hoey v. Hawkins*, 332 A.2d 403, 405 (Del. 1975) (internal quotation marks and citation omitted).

[37] *E.I. DuPont de Nemours & Co. v. Fla. Evergreen Foliage*, 744 A.2d 457, 461 (Del. 1999).

[38] *IQ Hldgs. Inc. v. Am. Commercial Lines, Inc.*, 2012 WL 3877790, at *2 (Del. Ch. Aug. 30, 2012).

13

effect as any other court order."[39] "Generally speaking, Delaware courts strictly adhere to discovery cut-off dates."[40]

A party that disregards the provisions in a scheduling order that govern discovery is engaging in discovery abuse. If a party cannot meet a deadline, the onus is on that party to be forthcoming and transparent about the situation and the reasons for it. Humans are not psychic. The other side does not know that the production may be late, much less how late or why. When parties are transparent, they can cooperate to address problems without judicial involvement. Acting as officers of the court, attorneys can find solutions to keep a case on track and prepare the matter for decision. Attorneys shirk their obligations to the court and make matters worse when they fail to communicate with the other side, allow problems to escalate, and miss critical deadlines. Then they impair their credibility when they try to make excuses that do not hold up.

"Discovery abuse has no place in [Delaware] courts, and the protection of litigants, the public, and the bar demands nothing less than that [Delaware] trial courts be diligent in promptly and effectively taking corrective action to 'secure the just, speedy and

---

[39] *Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1238 (Del. 2012) (alterations omitted) (internal quotation marks and citation omitted); *accord Sammons v. Doctors for Emergency Servs., P.A.*, 913 A.2d 519, 528 (Del. 2006).

[40] *Orloff v. Shulman*, C.A. No. 852-VCL (Del. Ch. April 10, 2007) (citation omitted).

14

inexpensive determination of *every* proceeding' before them."[41] "Trial courts should be diligent in the imposition of sanctions upon a party who refuses to comply with discovery orders, not just to penalize those whose conduct warrants such sanctions, but to deter those who may be tempted to abuse the legal system by their irresponsible conduct."[42]

"In the event this Court determines that sanctions for discovery abuses are appropriate, the sanction must be tailored to the culpability of the wrongdoer and the harm suffered by the complaining party."[43] Sanctions may serve one or more of three proper purposes: "punishment, deterrence[,] or coercion."[44] Court of Chancery Rule 37(b)(2) identifies possible sanctions that a trial court can impose for violating a discovery order, including but not limited to:

(A)     An order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order;

(B)     An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting that party from introducing designated matters in evidence; [or]

(C)     An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or

---

[41] *Holt v. Holt*, 472 A.2d 820, 824 (Del. 1984) (emphasis in original; quoting Delaware Superior Court Civil Rule 1).

[42] *Hoag v. Amex Assurance Co.*, 953 A.2d 713, 717 (Del. 2008) (internal quotation marks and footnote omitted).

[43] *Cartanza v. Cartanza*, 2013 WL 1615767, at *2 (Del. Ch. Apr. 16, 2013), *reargument denied*, 2013 WL 3376964 (Del. Ch. July 8, 2013).

[44] *In re Rinehardt*, 575 A.2d 1079, 1082 (Del. 1990).

15

proceeding or any part thereof, or rendering a judgment by default against the disobedient party[.][45]

A trial court also "has the power to issue sanctions for discovery abuses under its inherent equitable powers, as well as the Court's inherent power to manage its own affairs."[46]

Delaware Supreme Court decisions teach that the entry of a default judgment under Rule 37(b)(2)(C) is "*the ultimate sanction* for discovery violations and *should be used sparingly*."[47] "Judgment by default is, of course, the extreme remedy and generally speaking the Rule has been interpreted to require some element of willfulness or conscious disregard of the order before such a sanction is imposed."[48]

"A less final but still serious discovery sanction is the entry of an order under Rule 37(b)(2)(A) that deems designated facts to be established or which draws an inference as to a particular issue that is adverse to the party that failed to comply with its discovery obligations."[49] "A more moderate but still significant discovery sanction is to alter the

---

[45] Ct. Ch. R. 37(b)(2)(A)-(C).

[46] *Beard Research, Inc. v. Kates*, 981 A.2d 1175, 1189 (Del. Ch. 2009) (internal quotation marks and citation omitted); *see Hoag*, 953 A.2d at 716-17 (noting court's authority to impose sanctions for discovery abuse under Rule 37 or pursuant to its "inherent authority").

[47] *Lehman Capital v. Lofland ex rel Estate of Monroe*, 906 A.2d 122, 131 (Del. 2006) (emphasis in original; internal quotation marks and citation omitted).

[48] *Sundor Elec., Inc. v. E.J.T. Constr. Co., Inc.*, 337 A.2d 651, 652 (Del. 1975) (internal quotation marks and citation omitted).

[49] *James v. Nat'l Fin. LLC*, 2014 WL 6845560, at *9 (Del. Ch. Dec. 5, 2014).

burden of proof on a particular issue, either by shifting it to the party that failed to comply with its discovery obligations or by increasing or decreasing the relevant standard."[50]

More typical remedies for late production are to allow additional discovery or to preclude the use of the belatedly produced material. Rule 37(b)(2) further provides that if a defendant has violated a discovery order, the court "*shall* require the party failing to obey the order or the attorney advising that party or both to pay the reasonable expenses, including attorney's fees, caused by the failure."[51] Under this rule, expenses should be awarded "unless the Court finds that the failure was substantially justified or that other circumstances made an award of expenses unjust."[52] The Delaware Supreme Court has explained that under Rule 37, "when a party fails to comply with discovery orders of the Court or otherwise engages in discovery abuses, the award of attorneys' fees and expenses to the opposing party is mandatory, absent a showing by the wrongdoer that his actions were substantially justified or that other circumstances make the award unjust."[53] The current framing of the rule with its presumptive award of fees represented a change from prior practice.[54] It was adopted "in order to encourage such sanction under such circumstances, and to that end the Rule places a burden on the disobedient party to show

---

[50] *Id.*

[51] Ct. Ch. R. 37(b)(2) (emphasis added).

[52] *Id.*

[53] *Bader v. Fisher*, 504 A.2d 1091, 1096 (Del. 1986); *accord Holt*, 472 A.2d at 823.

[54] *Bader*, 504 A.2d at 1096.

17

that his failure was justified or that the other circumstances exist making an award unjust."[55]

## A.    The Entwistle Petitioners' Late Production

The Entwistle Petitioners violated a court order by failing to comply with the discovery cutoff in the Amended Scheduling Order. They did not produce any documents before the discovery cutoff. They did not communicate with the Company about any delay in production. They did not move to modify the discovery cutoff or seek leave to produce documents late. Six weeks after the discovery cutoff, they produced 6,058 documents consisting of 68,052 pages.

The Entwistle Petitioners have argued that they should not be held accountable for violating the Amended Scheduling Order because it took time for Co-Lead Counsel to negotiate search terms, then it took additional time for the Entwistle firm to gather and review documents from the Entwistle Petitioners. According to the Entwistle Petitioners, this is the ordinary method of collecting and producing documents, so it should not have been a problem for them to produce documents after the cutoff.

The fault lies not in the tasks that the Entwistle firm was performing but in the rate at which the firm performed them. Parties must deploy the resources necessary to meet

---

[55] *Wileman v. Signal Fin. Corp.*, 385 A.2d 689, 690-91 (Del. 1978) (internal citation omitted). *See generally* 8B Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice and Procedure* § 2288 (3d ed. 2010).

deadlines. If meeting a deadline appears difficult or impossible, then the party facing the deadline needs to confer with the other side or seek a modification of the schedule.

The Entwistle Petitioners had sufficient resources to meet the discovery cutoff. They are sophisticated investment funds who collectively owned one million shares. At the deal price, their stake was valued at $35,050,000. At the value claimed by their expert, their stake would be worth $50,140,000. They had access to Co-Lead Counsel and Rosenthal Monhait. If they had wanted to get the collection done, they could have.

The other petitioners produced documents before the discovery cutoff. The following chart identifies the date of production, the petitioner producing documents, and the volume of documents produced:

| Date | Fund | # of documents |
|---|---|---|
| September 5, 2017 | Lord Abbett Funds | 530 |
| | Pivot Point | 601 |
| September 12, 2017 | Sunrise | 1,858 |
| | Pivot Point | 190 |
| September 16, 2017 | Lord Abbett Funds | 2,633 |
| October 2, 2017 | Hudson Bay | 1,434 |
| | Lord Abbett Funds | 297 |
| | Sunrise | 1 |
| | Brookdale Funds | 163 |
| | Magnetar Petitioners | 506 |
| | **TOTAL:** | **8,213** |

There were some other petitioners who produced documents after the fact discovery cutoff, but only dribs and drabs. The Magnetar Funds produced nine additional documents on October 3, 2017, the Lord Abbett Funds produced one additional document on October

12, and Pivot Point produced three additional documents on November 8.[56] These documents should have been produced earlier, but humans are not perfect, and sometimes documents come in late. No one else made the type of massive, post-discovery production of their own documents that the Entwistle Petitioners made.

The Entwistle Petitioners have argued that the Company's failure to request documents until May 31, 2017, somehow excused their failure to comply with the Amended Scheduling Order. The Entwistle Petitioners also have argued that because the Company was not pressing them for documents in September and October, the Company must not have wanted the documents. Both responses seek to blame the injured party and deflect attention from the Entwistle Petitioners' misconduct.

When the Company served its discovery requests, there were still four months in the schedule. That was plenty of time for the Entwistle Petitioners to gather and produce documents. If they needed more time, it was their obligation to seek it, either from the Company or the court. Whether or not the Company nagged the Entwistle Petitioners about producing documents has no effect on the locus of the obligation. The Entwistle Petitioners had a duty to produce documents in a timely fashion. They cannot shift that obligation to the Company.

The bottom line is that even though the Entwistle Petitioners chose to file and litigate an appraisal claim, they shirked one of a litigant's basic obligations: gathering and

---

[56] Dkt. 72 ¶ 17-18.

producing responsive material in a timely fashion. They were happy to let the Company bear the expense of litigation while giving themselves a pass. Even when they did produce documents, the production was sloppy and haphazard.

This type of misconduct has consequences at two levels. One level involves actual prejudice in the specific case. Here, the belated production contained documents that the Company could have used in discovery, including a discounted cash flow analysis, a leveraged buy-out analysis, and communications about the Entwistle Petitioners' decision to buy or sell ExamWorks' stock and seek appraisal. The Company could have questioned representatives of the Entwistle Petitioners about these documents and used them with other witnesses as well.

A second level of prejudice involves the degradation of the litigation process. For the litigation system to function, parties must follow the rules. If participants suspect that others are not following the rules, then the process deteriorates. People who follow the rules feel like chumps when others seem to be cutting corners or breaking rules and getting ahead. People who otherwise might not think of pushing limits become more aggressive if they think everyone else is doing it. It is this broader, systemic interest that the Delaware Supreme Court seems to have had in mind when stressing that courts must address discovery abuse not only to protect litigants, but also to protect the public and the bar.[57]

_____

[57] *See Holt*, 472 A.2d at 824 ("Discovery abuse has no place in [Delaware] courts, and the protection of litigants, the public, and the bar demands nothing less than that [Delaware] trial courts be diligent in promptly and effectively taking corrective action . . . .").

As a remedy for the Entwistle Petitioners' discovery abuse, the Company seeks a terminating sanction that would dismiss the Entwistle Petitioners from the case and leave them with the deal price, without interest. They observe that, unlike in a traditional liability case, this sanction would not leave the Entwistle Petitioners empty handed. They would get $35.05 per share. They also would receive the per-share amount that was recovered in a settlement in a companion case for breach of fiduciary duty. Ironically, this sanction would let them avoid the downside risk of an appraisal award below the deal price. Depending on how the case turns out, the sanction might be a blessing.

The Delaware Supreme Court has cautioned that "a default judgment should be granted if no other sanction would be more appropriate under the circumstances."[58] Trial in this case originally was scheduled to begin on February 13, 2018, which would have limited my ability to craft an alternative sanction. After reviewing the parties' submissions, I postponed the trial so that I would have "greater flexibility in crafting a remedy, should the court conclude that a remedy is warranted."[59] Trial has not yet been rescheduled.

With the time afforded by the continuance, a lesser sanction than a default judgment becomes feasible and sufficient to remedy the Entwistle Petitioners' misconduct. The Entwistle Petitioners have already re-produced the documents without relevancy redactions. They also shall produce additional documents called for by this court's ruling

---

[58] *Hoag*, 953 A.2d at 717.

[59] Dkt. 107.

22

on their post-discovery-cutoff privilege logs.[60] Once the Entwistle Petitioners have completed this production, they shall produce witnesses for deposition as requested by the Company. The Company is not limited to one witness, but the Company should be responsible and only request additional witnesses if the contents of the documents and the results of an initial deposition truly warrant questioning more than one witness.

The Company's expert may take into account information learned from the Entwistle Petitioners' production and any depositions. The Company's expert may file a sur-rebuttal report addressing these matters. The petitioners contend that this remedy is disproportionate because it will prejudice all of the petitioners, not just the Entwistle Petitioners. That claim is overblown. As a threshold matter, Co-Lead Counsel had responsibility for conducting discovery on behalf of all petitioners, and depriving the Company of the Entwistle Petitioners' documents during discovery benefitted all petitioners. Consequently, imposing a remedy that affects all petitioners is not disproportionate. More importantly, the remedy is not excessive. The Company can file a sur-rebuttal report limited to the new material. The Company is not getting a complete do-over.

The Entwistle Petitioners shall bear all expenses associated with their late production of documents and the remedy imposed by this decision. The Company is awarded the expenses it has incurred and will incur, including attorneys' fees, for

---

[60] *See* Part II.C, *infra*.

- reviewing the Entwistle Petitioners' original production;

- following up with the Entwistle Petitioners;

- reviewing the unredacted production;

- briefing and arguing the Entwistle Motion;

- reviewing the additional documents produced in response to this decision;

- conducting the depositions contemplated by this decision; and

- working with the Company's expert to prepare the sur-rebuttal report.

Once the remedial discovery process is complete, the Company shall prepare and provide the Entwistle Petitioners with a Rule 88 affidavit documenting its fees and expenses. If the Entwistle Petitioners dispute the amount due and the parties cannot reach agreement, then the Company may file a motion to quantify the award, supported by the Rule 88 affidavit it provided to the Entwistle Petitioners.

## B.     The Barclays Documents

The petitioners violated a court order by failing to comply with the discovery cutoff in the Amended Scheduling Order. They agreed to produce documents from third parties, but they did not produce the Barclays Documents before the discovery cutoff. Ten weeks after the discovery cutoff, they produced the Barclays Documents.

A key difference between the Entwistle Petitioners' production and Co-Lead Counsel's production of the Barclays Documents is that the latter appears to have been inadvertent. Co-Lead Counsel explained that for all other third-party witnesses, the Company obtained copies of documents directly from the third party, rather than from the petitioners. It was no secret that the petitioners had subpoenaed documents from Barclays.

The petitioners filed their notice of service for the Barclays subpoena on the same day that they gave notice of subpoenas served on six other third parties. Co-Lead Counsel reasonably believed that the Company's attorneys would handle Barclays the same way they handled the other six third parties. The failure to produce the Barclays Documents constituted excusable neglect.

The Company again seeks a terminating sanction because of the late production of the Barclays Documents, this time for all petitioners. In my view, a terminating sanction is too severe. Other, less drastic remedies are available and sufficient to address the discovery issues in this case.

One option for leveling the playing field is to hold that no one can use the Barclays Documents. Co-Lead Counsel has proposed that option, which includes striking the references to the documents from the petitioners' expert report and not using the documents at trial.

Another option for leveling the playing field is to let everyone use the Barclays Documents. Under this option, the parties would have leave to depose a Barclays witness. Both sides could prepare supplemental expert reports addressing any information in the Barclays Documents or obtained from the Barclays witness. Both sides would be able to use the resulting discovery at trial.

Because the Company was harmed by the late production of the Barclays Documents, the Company can choose which remedy it prefers. The Company has ten days to notify Co-Lead Counsel of its election.

Having found that the failure to produce the Barclays Documents was inadvertent, I will not require petitioners to reimburse the Company for the expenses incurred in reviewing the Barclays Documents or pursuing any further Barclays-related discovery, if they choose that option. I could require the petitioners to reimburse the Company for the expenses incurred briefing and arguing the Barclays Motion, but I did not require the Company to reimburse the petitioners for the expenses incurred briefing and arguing the motion for a protective order involving Berkshire. This is a similar situation and should be treated similarly.

## C. The Privilege Logs

The Entwistle Petitioners and the G&E Petitioners violated a court order by failing to produce their privilege logs until after the discovery cutoff. Privilege logs are part of discovery. Producing a timely log is part of a party's obligation when asserting privilege.

In their responses to the Company's discovery requests, the Entwistle Petitioners and the G&E Petitioners represented that they would produce documents subject to claims of privilege. The burden of establishing privilege rests on the party asserting it.[61]

> [A] bare allegation that information and documents are protected from discovery by the attorney-client privilege is insufficient without making more information available . . . . It is incumbent on one asserting the privilege

---

[61] *Moyer v. Moyer*, 602 A.2d 68, 72 (Del. 1992); *accord Sokol Hldgs., Inc. v. Dorsey & Whitney, LLP*, 2009 WL 2501542, at *6 n.28 (Del. Ch. Aug. 5, 2009) (Strine, V.C.); *SICPA Hldgs., S.A. v. Optical Coating Lab., Inc.*, 1996 WL 636161, at *7 (Del. Ch. Oct. 10, 1996); *Emerald P'rs v. Berlin*, 1994 WL 125047, at * 1 (Del. Ch. Mar. 30, 1994); *Hoechst Celanese Corp. v. Nat'l Union Fire Ins. Co.*, 623 A.2d 1118, 1122 (Del. Super. 1992); *In re Fuqua Indus., Inc. S'holders Litig.*, 1992 WL 296448, at *3 (Del. Ch. Oct. 8, 1992); *Deutsch v. Cogan*, 580 A.2d 100, 107 (Del. Ch. 1990).

26

to make a proper showing that each of the criteria [underlying the attorney-client privilege] exist[s] . . . . A proper claim of privilege requires a specific designation and description of the documents within its scope as well as precise and certain reasons for preserving their confidentiality.[62]

An insufficiently supported claim of privilege can result in waiver.[63]

The privilege log enables the party that requested documents to evaluate the producing party's claim of privilege. "The log is supposed to provide sufficient information to enable the adversary to assess the privilege claim and decide whether to mount a challenge . . . . Just as you can't hit what you can't see, you can't challenge what the other side hasn't described."[64] Producing a privilege log after the discovery cutoff prevents the opposing party from evaluating the log, making timely challenges, and using the resulting documents in discovery. Producing a post-cutoff log has the same effect as not producing

---

[62] *Int'l Paper Co. v. Fibreboard Corp.*, 63 F.R.D. 88, 93–94 (D. Del. 1974); *see also Sokol Hldgs.*, 2009 WL 2501542, at *8; *Deutsch*, 580 A.2d at 107; *Reese v. Klair*, 1985 WL 21127, at *5 (Del. Ch. Feb. 20, 1985).

[63] *See, e.g., Willemijn Houdstermaatschaapij BV v. Apollo Comput., Inc.*, 707 F. Supp. 1429, 1443 (D. Del. 1989) (ordering production of inadequately described documents); *Mechel Bluestone, Inc. v. James C. Justice Cos., Inc.*, 2014 WL 701194, at *5 (Del. Ch. Dec. 12, 2014) (collecting authorities and ordering partial waiver on facts of case); *Klig v. Deloitte LLP*, 2010 WL 3489735, at *8 (Del. Ch. Sept. 7, 2010) (collecting authorities and finding waiver on facts of case); *Sokol Hldgs.*, 2009 WL 2501542, at *8 ("Sokol has waived the right to [assert privilege] by failing to update its privilege log to contain detailed enough descriptions . . . ."). *See generally* 1 Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 7.04 (2012).

[64] *Klig*, 2010 WL 3489735, at *6.

a log, which is the same thing as not providing any support for a claim of privilege. "An improperly asserted claim of privilege is no claim of privilege at all."[65]

The Entwistle Petitioners and the G&E Petitioners failed to produce their logs until months after the discovery cutoff. On the facts of this case, waiver is an appropriate consequence. The Entwistle Petitioners and G&E Petitioners need not produce entries where (i) counsel was the author or a principal recipient (not simply a copy recipient) *and* (ii) the item post-dates the filing of the appraisal proceeding on August 25, 2016.

The Company has leave to conduct supplemental depositions of the petitioners' representatives to explore any materials produced after their depositions or as a result of this decision. Each of the petitioners shall bear the cost of the supplemental depositions of its own representatives. As with any supplemental depositions resulting from the Entwistle Petitioners' late production, the Company should not abuse this opportunity. It should only take the depositions that are necessary.

## III. CONCLUSION

The motions for sanctions are granted. The parties shall proceed as directed in this decision.

---

[65] *Int'l Paper*, 63 F.R.D. at 94; *accord TCV VI, L.P. v. TradingScreen Inc.*, 2015 WL 5674874, at *8 (Del. Ch. Sept. 25, 2015); *Mechel Bluestone*, 2014 WL 701194, at *5; *M & G Polymers USA, LLC v. Carestream Health, Inc.*, 2010 WL 1611042, at *51 n.262 (Del. Super. Apr. 21, 2010); *Williams Nat. Gas Co. v. Amoco Prod. Co.*, 1991 WL 236919, at *2 (Del. Super. Nov. 8, 1991); *Council of Unit Owners of Sea Colony E. v. Carl M. Freeman Assocs., Inc.*, 1990 WL 161169, at *2 (Del. Super. Sept. 26, 1990); *Playtex, Inc. v. Columbia Cas. Co.*, 1989 WL 5197, at *2 (Del. Super. Jan. 5, 1989); *Reese*, 1985 WL 21127, at *5.